UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ SEP 10 2015 ★
BROOKLYN OFFICE

-------------------------------------------------------------------x
POINT 4 DATA CORP. and DYNAMIC
CONCEPTS, INC.,

             Plaintiffs,

     - against -

TRI-STATE SURGICAL SUPPLY &
EQUIPMENT, LTD., SJ COMPUTERS, INC.,
and SHMUEL JUDKOVITZ,

             Defendants.
-------------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
11-CV-726 (CBA) (RLM)

AMON, Chief United States District Judge.

     After nearly four years of litigation, on January 29, 2015, the Court entered Judgment in

favor of defendants Tri-State Surgical Supply & Equipment, Ltd., SJ Computers, Inc. and

Shmuel Judkovitz ("Tri-State") on all of the claims brought by plaintiffs, and in favor of

plaintiffs Point 4 Data Corp. and Dynamic Concepts, Inc. ("plaintiffs") on all counterclaims

raised by defendants. (DE #364.) Tri-State now moves for an award of attorneys' fees pursuant

to the fee-shifting provisions of the Digital Millennium Copyright Act ("DMCA"), the Lanham

Act and the contract between the parties, and additionally seeks an award of costs under Federal

Rule of Civil Procedure 54(d). (DE #372.) For the reasons set forth herein, the Court denies Tri-

State's fee motion, but concludes that it is entitled to costs.

## BACKGROUND

     Tri-State's current request is the most recent salvo in a long and protracted legal battle

between the parties. The Court assumes familiarity with the facts as set forth in its numerous

prior Orders. See, e.g., Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd., No. 11-

CV-726 (CBA) (RLM), 2012 WL 3306600 (E.D.N.Y. June 13, 2012) ("Point 4 I"), adopted by

2012 WL 3306575 (E.D.N.Y. Aug. 13, 2012) ("Point 4 II"); Point 4 Data Corp. v. Tri-State

Surgical Supply & Equip., Ltd., No. 11-CV-726 (CBA) (RLM), 2013 WL 4409434 (E.D.N.Y. Aug. 2, 2013) ("Point 4 III"), adopted as modified by 2013 WL 5502852 (E.D.N.Y. Oct. 1, 2013) ("Point 4 IV") and Memo. & Order, DE #352, No. 11-CV-726 (E.D.N.Y. Sept. 17, 2014) ("Point 4 V"). Accordingly, it summarizes below only those facts most relevant to Tri-State's pending motion.

This case stems from a relatively straightforward licensing dispute. In 1999, Tri-State, a Brooklyn-based medical supply company, purchased accounting software, called Genesys, from Point 4 subject to an Equipment Purchase, Software License, Programming and Installation Services Agreement, dated August 31, 1999 (the "Agreement"). Point 4 III, 2013 WL 4409434, at *1. Because Genesys runs on UniBasic, a programming language developed by plaintiff Dynamic Concepts, Inc. ("DCI"), the Agreement provided Tri-State with a 48-user license for each program subject to certain restrictions. Id.

"UniBasic is embedded with security protections to enforce licensing restrictions, such as the number of concurrent users." Id. at *2. Specifically, every installation of UniBasic is assigned a unique license number, which is paired with a corresponding Software Selection Number ("SSN") that identifies the particular product version and the number of concurrent users allowed under the license. Id. A program called Passport Licensing Security Software ("Passport") communicates with an external hardware device known as a dongle to verify the license. Id. After Passport successfully authenticates the license, UniBasic will launch. Point 4 I, 2012 WL 3306600, at *3. Passport will continue to run in the background while the user is running UniBasic and, if at any point UniBasic detects that Passport is not running, it will launch a new version of Passport. Id. If Passport is unable to launch or detects a licensing violation, it will display an error message and UniBasic will terminate. Id.

2

A dispute between the parties first arose in 2002 when Tri-State refused to pay Point 4 a portion of the agreed purchase price. (Press Ex. 2.) After an arbitration award in favor of Point 4, the parties ceased all communication. (Id.); Point 4 III, 2013 WL 4409434, at *2. As a result, when Tri-State moved the Software to a new server in 2007 it did not inform plaintiffs. Point 4 III, 2013 WL 4409434, at *2. Following that transfer, the Software began experiencing a recurring problem that prevented Tri-State from accessing it following a server reboot. Id. Although Tri-State's technology consultant was able to devise a temporary fix to that problem, a dispute with that consultant in March 2010 ultimately led Tri-State to ask plaintiffs for assistance. Id. But when Point 4 informed Tri-State that it required an upgrade to the most recent version of the Software, which would cost more than $30,000, discussions between the parties came to an abrupt end. Id. at *3.

Instead of paying that upgrade fee, Tri-State began exploring alternative solutions to its recurring problem. Id. Another of its consultants, defendants Judkovitz and SJ Computers, retained DongleLabs, an overseas entity, to resolve the issue. Id. Acting on Tri-State's behalf, Judkovitz provided DongleLabs with access to the UniBasic code. Id. at *3 & n.8. Nima Goldstein, a DongleLabs employee—who plaintiffs claim is actually the Iranian hacker Nima Golestaneh—then modified the code to end-run certain security procedures, including Passport.[1] Id. Those modifications resolved the recurring problem and also permitted Tri-State to exceed the 48-user limit imposed by the license.[2] Id. at *3 & n.7.

---

[1] The two experts retained by plaintiffs each identified three modifications to the UniBasic code. Point 4 III, 2013 WL 4409434, at *5. Subsequently, Douglas Chadwick, the CEO of DCI, submitted a declaration describing an additional modification to the Passport that executed each time the Software was run. Id. That additional modification, dubbed the "Fourth Modification" by Tri-State, provided the basis for plaintiffs' claim that there were tens of thousands of acts of circumvention, each of which supported a separate award of statutory damages. Id.

[2] The parties dispute whether Tri-State, in fact, ever exceeded the 48-user limit.

3

Plaintiffs first discovered Tri-State's hack in late June 2010 as a result of a call Judkovitz made to a UniBasic specialist named Roger Petersen. Id. Based on the information provided by Judkovitz, Petersen began to suspect that Tri-State was running an unlicensed version of UniBasic and had transferred the Software to a server other than the one on which it was originally installed. Id. Following that call, Petersen informed the CEO of DCI, Douglas Chadwick ("Chadwick"), of his suspicions and Chadwick shared those concerns with Don Burden ("Burden") the CEO of Point 4 on July 6, 2010. Id. That same day, Chadwick followed up via email with Michelle Nicol, Point 4's Vice President, who responded:

> We have been waiting for them to do something like this for 10 years. I knew it was just a matter of time until they would try and go around (both of us). . . . These guys are cheap SOB's and they will do anything to get around the system.

(DE #309 Ex. 36.) Plaintiffs initially drafted a letter demanding that Tri-State stop using the unlicensed Software, but later decided not to send it. Point 4 III, 2013 WL 4409434, at *4. Instead, they retained counsel to assess potential legal remedies and a private investigator to further investigate their suspicions. Id.

Plaintiffs ultimately filed suit seven months later, on February 14, 2011. Id. Then-Chief Judge Raymond J. Dearie entered a temporary restraining order that same day and, after a hearing, issued a consent injunction against Tri-State on March 7, 2011. Id. To prevent further violations, the parties agreed that plaintiffs would be able to remotely monitor the server on which Tri-State housed the Software. (See Press Ex. 11 at 22:14-15, 24:3-25.)

On February 21, 2012, Tri-State moved for partial summary judgment on the scope of damages allowed under the DMCA. (DE #125.) Specifically, Tri-State challenged plaintiffs' claim for all the profits Tri-State earned while using the hacked software and sought to limit its liability for statutory damages to a single act of circumvention. See Point 4 I, 2012 WL

4

3306600, at *1. Because the plain text of the DMCA permits disgorgement only of those profits traceable to the circumvention and plaintiffs had failed to properly track the claimed profits back to the hack, the Court granted Tri-State's motion to dismiss the lost profits claim. See id. at *6-10, adopted by Point 4 II, 2012 WL 3306575. But it denied the motion to limit damages to a single act of circumvention based on plaintiffs' then-undisputed claim that the hack included "a modified script . . . programmed to execute each time a Tri-State user logged in, issuing instructions to bypass the Passport security system." Id. at *11. As such, the Court concluded that each log-in could give rise to a distinct act of circumvention supporting a separate award of statutory damages.[3] Id. at *11-13, adopted by Point 4 II, 2012 WL 3306575, at *5.

Following the close of fact and expert discovery, the parties cross-moved for summary judgment on their various claims, affirmative defenses and counterclaims. (DE #262, 288.) In support of their motion, plaintiffs submitted declarations from Chadwick and Burden—the CEOs of DCI and Point 4, respectively—and Tri-State properly moved to strike those declarations as untimely expert disclosures. After disregarding those declarations, the Court granted summary judgment concluding that plaintiffs had failed to carry their burden on the DMCA and Lanham Act claims and had abandoned the bulk of their contract damages. See Point 4 III, 2013 WL 4409434, adopted as modified by Point 4 IV, 2013 WL 5502852, and Point 4 V, Memo. & Order, DE #352, No. 11-CV-726.

To facilitate their appeal, plaintiffs then stipulated to the dismissal of the remaining portion of their claim for contract damages and the Court entered Judgment on January 29, 2015. (DE #364.) Tri-State moved for an award of attorneys' fees and costs on February 23, 2015 (DE #372), and plaintiffs timely appealed on February 25, 2015 (DE #367). Tri-State moved for a

---

[3] As the Court noted, that conclusion did "not foreclose Tri-State from factually contesting how the [hack]f operated or 'the total number of circumventions' that occurred." Point 4 II, 2012 WL 3306575, at *2 (quoting Point 4 I, 2012 WL 3306600, at *11 n.13).

stay of the appeal pending resolution of its fee motion and the Court of Appeals granted its request on March 9, 2015.  (DE #382.)

## DISCUSSION

Tri-State moves for an award of fees and costs related to each of the three categories of claims plaintiffs brought in this action. Tri-State argues that it is entitled to an award of fees pursuant to 17 U.S.C. § 1203(b)(5), as the prevailing party on the DMCA claims, 15 U.S.C. § 1117(a)(3), as the prevailing party on the Lanham Act claims, and pursuant to Paragraph 21 of the Agreement between the parties, as the prevailing party on the contract claims. Tri-State also seeks an award of costs under Federal Rule of Civil Procedure 54(d) as the prevailing party in the action.  Plaintiffs oppose each of those requests.

## I.    Fees on the DMCA Claims

Under Section 1203 of Title 17, the Court "in its discretion may award reasonable attorney's fees to the prevailing party" in a DMCA action. 17 U.S.C. § 1203(b)(5). As the Supreme Court has emphasized, such awards are not "automatic" and instead are entrusted to the district court's "equitable discretion."[4] Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 (1994).  In

---

[4] Tri-State correctly notes that the Seventh Circuit imposes a strong presumption in favor of an award when defendants are the prevailing party.  See Assessment Techs. of Wis., LLC v. Wire Data, Inc., 361 F.3d 434, 437 (7th Cir. 2004). Because such a finding is contrary to Fogerty's express rejection of a presumption in favor of either party, the Court joins the growing chorus of courts that have declined to follow Assessment Technologies.  See Marshall & Swift/Boeckh, LLC v. Dewberry & Davis LLC, 586 F. App'x 448, 449 (9th Cir. 2014) (rejecting Assessment Techs.); Jovani Fashion, Ltd. v. Cinderella Divine, Inc., 820 F. Supp. 2d 569, 575 (S.D.N.Y. 2011) (same); ZilYen, Inc. v. Rubber Mfrs. Ass'n, 958 F. Supp. 2d 215, 219 (D.D.C. 2013) (same); see also Lava Records, LLC v. Amurao, 354 F. App'x 461, 463 (2d Cir. 2009) (expressly rejecting such a presumption); accord Matthew Bender & Co. v. W. Pub. Co., 240 F.3d 116, 121 (2d Cir. 2001) (noting that "the standard governing the award of attorneys' fees . . . should be identical for prevailing plaintiffs and prevailing defendants").

In addition, Tri-State cites cases stating that in the copyright context an award of attorneys' fees is the "rule rather than the exception and should be [made] routinely." Yash Raj Films (USA) Inc. v. Movie Time Video USA, Inc., No. 04-CV-5107 (JG) (RML), 2007 WL 2572109, at *4 (E.D.N.Y. July 26, 2007) (default judgment) (internal quotation marks and citation omitted); see also Bridgeport Music, Inc. v. WB Music Corp., 520 F.3d 588, 592 (6th Cir. 2008) (similar); Pharmacy Records v. Nassar, 572 F. Supp. 2d 869, 880 (E.D. Mich. 2008) (similar). To the extent Tri-State relies on those cases to argue that the Court should weight the scales in favor of an award, that argument flies in the face of the well-settled rule that awards "are not automatic" and rest instead in the "equitable

6

exercising that discretion, courts employ "no precise rule or formula," id. (citation omitted), but instead analyze whether an "award would . . . vindicate underlying statutory policies" or equitable concerns, Warner Bros. Inc. v. Dae Rim Trading, Inc., 877 F.2d 1120, 1127 (2d Cir. 1989). The factors relevant to that analysis typically include—but are not limited to—the opposing party's "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."[5] Fogerty, 510 U.S. at 534 n.19 (citation omitted) (cautioning that such factors are useful only "so long as [they] are faithful to the [statutory] purposes").

The Court looks to statutory purpose to navigate that discretionary inquiry. Fogerty, 510 U.S. at 534. Congress enacted the DMCA in 1998 "to strengthen copyright protection in the digital age." Universal City Studios, Inc. v. Corley, 273 F.3d 429, 435 (2d Cir. 2001). In particular, it sought "to encourage copyright owners to make their works available through digital networks," Jane C. Ginsburg, Copyright and Control over New Technologies of Dissemination, 101 Colum. L. Rev. 1613, 1618 (2001), by combating "the threat of 'massive piracy . . . due to the ease with which [digital works] can be copied and distributed worldwide virtually instantaneously,'" Lexmark Int'l, Inc. v. Static Control Components, Inc., 387 F.3d 522, 549 (6th Cir. 2004) (quoting S. Rep. No. 105-190, at 8 (1998)); accord H.R. Rep. No. 105-551(I), at 25 (1998) ("In contrast to the analog experience, digital technology enables pirates to

---

discretion" of the district court. Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc., 290 F.3d 98, 117 (2d Cir. 2002) (citing Fogerty, 510 U.S. at 534).

[5] Case law analyzing requests for fees under the Copyright Act apply with equal force here because requests for attorneys' fees under the DMCA "are governed by the same standard" as those made under the Copyright Act. Dice Corp. v. Bold Techs. Ltd., No. 11-CV-13578 (TLL), 2014 WL 2763618, at *30 n.6 (E.D. Mich. June 18, 2014); accord Universal City Studios, Inc. v. Reimerdes, 111 F. Supp. 2d 294, 345 (S.D.N.Y. 2000) (denying award of fees under the DMCA after applying factors relevant to a fee award under the Copyright Act); Dahn World Co., Ltd. v. Chung, No. 06-CV-2170 (RWT), 2009 WL 277603, at *2 (D. Md. Feb. 5, 2009) (same).

reproduce and distribute perfect copies of works—at virtually no cost at all to the pirate."). By adopting anti-circumvention provisions that made illegal attempts to end-run or disable "the efforts of copyright owners to protect their works from piracy behind digital walls," Corley, 273 F.3d at 435, Congress hoped to encourage copyright owners to "mak[e] available quickly and conveniently via the Internet the movies, music, software, and literary works that are the fruit of American creative genius." S. Rep. 105-190, at 8 (1998).

### A.   Plaintiffs Took Reasonable Litigation Positions

Because parties who take objectively unreasonable litigation positions do little to clarify the law or serve the statutory purpose, courts routinely award fees against such parties both to compensate their opponents and deter others from raising such meritless claims. See Matthew Bender & Co. v. W. Pub. Co., 240 F.3d 116, 122 (2d Cir. 2001). But, "[o]f course, an unsuccessful claim does not necessarily equate with an objectively unreasonable claim." Effie Film, LLC v. Pomerance, No. 11-CV-7087 (JPO), 2013 WL 1759560, at *2 (S.D.N.Y. Apr. 24, 2013) (internal quotation marks and citation omitted). Indeed, the mere fact that the Court granted summary judgment against a party "does not in itself render [its] claim unreasonable." Jovani Fashion, Ltd. v. Cinderella Divine, Inc., 820 F. Supp. 2d 569, 573 (S.D.N.Y. 2011). Although the Court need not make a finding of "frivolousness or bad faith to award a fee," Sparaco v. Lawler, Matusky, Skelly, Eng'rs LLP, 60 F. Supp. 2d 247, 258-59 (S.D.N.Y. 1999), generally courts in this Circuit find claims to be objectively unreasonable only when they "are clearly without merit or otherwise patently devoid of legal or factual basis." Jovani Fashion, 820 F. Supp. 2d at 573 (quoting Silberstein v. Fox Entm't Grp., Inc., 536 F. Supp. 2d 440, 444 (S.D.N.Y. 2008)). "In other words, the question is not whether there was a sufficient basis for judgment in favor of defendants, but whether the factual and legal support for plaintiff's position was so lacking as to render its claim . . . objectively unreasonable." Penguin Books U.S.A., Inc.

v. New Christian Church of Full Endeavor, Ltd., No. 96-CV-4126 (RWS), 2004 WL 728878, at *3 (S.D.N.Y. Apr. 6, 2004) (internal quotation marks and citation omitted).

Tri-State argues that plaintiffs' position was objectively unreasonable because they failed to "present any evidence of (i) the copyrightability of the Software . . . (ii) the purported Fourth Modification . . . or (iii) [the] actual damages incurred." (Mot. at 16.) Tri-State further claims that plaintiffs "repeatedly advanced factual arguments that were recklessly, if not knowingly, false" and improperly "sought to recast" their DMCA claims as contractual ones after the Court granted summary judgment due to lack of evidence on the copyright issue. (Id.) Finally, Tri-State charges that plaintiffs improperly claimed more than $100 million in statutory damages, despite having no proof of actual harm, and unreasonably refused Tri-State's settlement offer. (Id. at 11-12; Reply at 5-6.) Plaintiffs respond that their claims were reasonable and Tri-State prevailed only because the Court excluded its evidence of copyrightability—declarations from Chadwick and Burden—due to a violation of the expert discovery rules. (Opp. at 29.) Moreover, plaintiffs argue that they reasonably sought statutory damages based on Tri-State's repeated circumvention of the Software's security protocols and therefore appropriately refused Tri-State's settlement offer as inadequate. (Id. at 30, 33.)

     1.    Evidence in the Record

Plaintiffs' DMCA claims not only find support in the record, but the facts underlying those claimed violations are largely undisputed. Tri-State admits that when faced with purportedly malfunctioning software it opted to hire a hacker to "modif[y] the executable binary file for UniBasic [to] disable[] the dongle software" rather than pay the necessary upgrade fee.[6]

---

[6] Tri-State does, however, dispute the legal import of those actions, arguing (among other things) that the DMCA does not bar the efforts of a licensee to correct malfunctioning software. (See, e.g., Tri-State Mem. of Law in Further Supp. of its Mot. for Summ. J. & in Opp. to Pls.' Cross-Mot. ("Tri-State SJ Reply & Opp.") at 54-58, DE #266.)

(DE #130 at 9.) Based on that admitted manipulation, Judge Dearie stated at the preliminary injunction hearing that Tri-State's liability was "a foregone conclusion," (Press Ex. 11 at 11:12-25), as it had "offered no valid defense to plaintiffs' DMCA claim," (DE #32 at 2).[7]

To raise an anti-circumvention claim under the DMCA, a plaintiff must start by showing that the digital barrier in question guarded a work protected by the copyright law. See Point 4 III, 2013 WL 4409434, at *17 (quoting 17 U.S.C. § 1201(a)(1)(A)). A work registered with the Copyright Office enjoys a presumption of copyright validity, whereas unregistered works require proof of sufficient originality and creativity. See id. Because plaintiffs here did not register a copyright in their Software, they instead relied on declarations from Chadwick and Burden to satisfy that standard. See id. at *8-9, *11-12 (noting passages of the declarations discussing the "unique" features of the Software). Despite the technical nature of that inquiry, plaintiffs relied—albeit, mistakenly—on Second Circuit precedent to argue that those declarations contained only lay testimony and therefore were not subject to the disclosure requirements of Rule 26(a)(2). See id. at *7-13. The magistrate judge disagreed and ultimately struck both declarations due to plaintiffs' violations of the discovery rules. See id. at *13-17. Over plaintiffs' objections, this Court affirmed the bulk of that exclusion and, as a result, adopted the magistrate judge's recommendation that summary judgment be granted on the DMCA claims because plaintiffs had failed "to create an issue of fact with respect to the copyrightability of the Software." Point 4 IV, 2013 WL 5502852, at *7 (quoting Point 4 III, 2013 WL 4409434, at *17).

Tri-State now argues that because the record without the declarations contains no support for plaintiffs' DMCA claims, those claims must be unreasonable. That misunderstands the

---

[7] Of course, that preliminary assessment of plaintiffs' claim does not undermine the Court's ultimate grant of summary judgment on those claims based on plaintiffs' failure to establish that the Software was entitled to copyright protection.

inquiry. The Court does not judge the reasonableness of plaintiffs' actions with the benefit of hindsight, but rather asks whether their claims found factual and legal support at the time they were made. TVT Records, Inc. v. Island Def Jam Music Grp., 446 F. Supp. 2d 235, 238-39 (S.D.N.Y. 2006); accord Garnier v. Andin Int'l, Inc., 884 F. Supp. 58, 62 (D.R.I. 1995) ("Hindsight is not the applicable standard in judging the reasonableness of [plaintiff's] suit, and, at the time of initiation, [plaintiff] took a reasonable stand on an unsettled principle of law."). Here, summary judgment was granted not because there was no potential merit to plaintiffs' DMCA claims, but rather because the Court struck the key evidence regarding the original and protectable nature of the Software.[8] Based on Second Circuit precedent interpreting Federal Rule of Evidence 701(c) and Point 4 I, plaintiffs made at least a reasonable argument that those declarations offered only lay testimony outside the disclosure mandate of Rule 26. Although the Court ultimately found those arguments unconvincing, plaintiffs were not unreasonable in making them and therefore they do not justify a fee award. Effie Film, 2013 WL 1759560, at *2; Jovani Fashion, 820 F. Supp. 2d at 573; Penguin Books, 2004 WL 728878, at *3.

2.  Statutory Damages

Second, Tri-State argues that plaintiffs unreasonably pursued a large award of statutory damages despite failing to identify any actual harm that resulted from Tri-State's actions. But "it is clear that statutory damages can be awarded even in the absence of sufficient evidence supporting actual damages." Agence France Presse v. Morel, No. 10-CV-2730 (AJN), 2014 WL 3963124, at *10 (S.D.N.Y. Aug. 13, 2014) (citing Columbia Pictures Television, Inc. v. Krypton

---

[8] Notably, as a result of that finding, the Court did not reach Tri-State's alternative arguments for summary judgment on the DMCA claims—i.e., "whether the security measures prevented 'access' under section 1201(a)(1)(A), whether plaintiffs have met their burden with respect to their claimed actual and statutory damages under the DMCA, or whether an unauthorized supplemental report by Cox concerning DMCA statutory damages should be precluded." Point 4 III, 2013 WL 4409434, at *20 n.36. The Court here likewise offers no view on the merits of those claims here.

11

Broad. of Birmingham, Inc., 259 F.3d 1186, 1194 (9th Cir. 2001)); accord F.W. Woolworth Co.
v. Contemporary Arts, 344 U.S. 228, 233 (1952) ("Even for uninjurious and unprofitable
invasions of copyright the court may, if it deems just, impose a liability within statutory limits to
sanction and vindicate the statutory policy"); Sony BMG Music Entm't v. Tenenbaum, 660 F.3d
487, 507 (1st Cir. 2011) ("Congress drew a plain distinction between actual and statutory
damages, making it clear that the availability of statutory damages is not contingent on the
demonstration of actual damages."); Lowry's Reports, Inc. v. Legg Mason, Inc., 302 F. Supp. 2d
455, 459 (D. Md. 2004) ("Because statutory damages are an alternative to actual damages, there
has never been a requirement that statutory damages must be strictly related to actual injury.").
Given that the DMCA expressly allows plaintiffs to elect statutory, rather than actual, damages,
17 U.S.C. § 1203(c)(3), the Court cannot conclude that the plaintiffs acted unreasonably in
exercising that option. See Matthew Bender, 240 F.3d at 126.

Surprisingly, Tri-State fails to mention that it already raised and lost precisely this
argument on partial summary judgment.[9] In that motion, Tri-State principally argued that its
hack should constitute only a single act of circumvention because "it would be 'absurd' to award
plaintiffs millions of dollars [in statutory damages] where Tri-State's alleged circumvention was
aimed at avoiding a $32,637 licensing fee for upgrading the software." Point 4 I, 2012 WL
3306600, at *11. In rejecting Tri-State's argument, the magistrate judge concluded that although
the statutory damages sought may be "disproportionate" to plaintiffs' actual injuries, such an
award would not be absurd. Id. at *13. Because "this Court is constrained to follow the
statutory language, whatever the apparent inequities," the magistrate judge permitted plaintiffs to

---

[9] In Point 4 I, Magistrate Judge Mann explicitly found that "assuming plaintiffs' version of the facts to be true, each
user login gave rise to a separate 'act of circumvention.'" 2012 WL 3306600, at *13. Given that ruling, the Court is
frankly baffled by Tri-State's claim at oral argument that, "as a matter of law," plaintiffs would "not have been
entitled to statutory damages" if they had prevailed on their theory of the DMCA claim. (Oral Arg. Tr. at 7:13-17.)

pursue a separate award of statutory damages on each of the thousands of acts of circumvention claimed. Id. at *13-14 (citing cases coming to the same conclusion). Since the magistrate judge agreed with plaintiffs' position on statutory damages and this Court adopted that finding without objection, Point 4 II, 2012 WL 3306575, at *5, it was plainly a reasonable one. See Matthew Bender, 240 F.3d at 122-23 (finding it is "beyond dispute that . . . [arguments adopted by the dissent] were objectively reasonable").

New Line Cinema Corp. v. Russ Berrie & Co., 161 F. Supp. 2d 293 (S.D.N.Y. 2001), and Peer International Corp. v. Luna Records, Inc., 887 F. Supp. 560 (S.D.N.Y. 1995), are not to the contrary. Those cases do not mandate a direct correlation between actual and statutory damages; rather, they stand merely for the proposition that actual damages are one of the factors a court can consider in making a statutory award. See Psihoyos v. John Wiley & Sons, Inc., 748 F.3d 120, 126 (2d Cir. 2014) ("Although revenue lost is one factor to consider, we have not held that there must be a direct correlation between statutory damages and actual damages."). To the contrary, courts have upheld large awards of statutory damages regardless of the actual harm suffered because statutory damages "are not meant to be merely compensatory or restitutionary," but instead serve to vindicate the statutory purpose by "discourag[ing] wrongful conduct." Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 113 (2d Cir. 2001) (affirming award of statutory damages despite defendant's claim that they bore "little relationship" to actual damages); accord L.A. Printex Indus., Inc. v. Does 1-10, 543 F. App'x 110, 111 (2d Cir. 2013) (affirming award of statutory damages that was "disproportionate" to actual damages because it did not "shock the conscience"); UMG Recordings, Inc. v. MP3.Com, Inc., No. 00-CV-472 (JSR), 2000 WL 1262568, at *5-6 (S.D.N.Y. Sept. 6, 2000) (approving award of up to $118 million despite lack of evidence related to actual harm).

13

In an attempt to salvage his position, during oral argument counsel for Tri-State appeared to argue that plaintiffs had conceded that there must be a relationship between statutory and actual damages:

> THE COURT: Well, no, that's not actually what the law is, is it, counsel? There are cases that you can look to actual damages for determining statutory damages but you don't have to have actual damages in order to show an entitlement to statutory damages. That's not what the law is as you've just stated it.
>
> MR. NAGY: Your Honor, respectfully, it is absolutely what the law is.
>
> THE COURT: Oh, it is?
>
> MR. NAGY: It is. If you look at New Line Cinema, Your Honor, **which we cite without opposition, there's no response**, that case holds precisely that actual damages and statutory damages are supposed to be commensurate. Similarly, we cite another opinion to Your Honor, it was an opinion by now Justice Sotomayor in which she discussed this precise issue.

(Oral Arg. Tr. at 4:23-5:13 (emphasis added).) That is, at best, a half-truth. The critical detail that counsel conveniently omitted is that he cited those cases only in his reply brief. Because plaintiffs were not entitled to respond to the reply, their silence concedes nothing. In any event, since those cases do not require the bright-line rule that Tri-State advocates, the Court concludes that plaintiffs' decision to seek statutory damages, as provided by the DMCA, does not justify a fee award.

Nor does Nimmer on Copyright support Tri-State's claim that plaintiffs acted unreasonably in seeking a large award of statutory damages. During oral argument, counsel for Tri-State relied on Nimmer to argue that statutory and actual damages "need to be made out of the same bolt of cloth" and "there's got to be some relationship" between the two.[10] (Oral Arg. Tr. 14:15-19.) Contrary to counsel's claim that such a relationship is necessary as a matter of

---

[10] Neither party cited this or any other section of Nimmer in connection with the pending fee motion.

black-letter law, the cited portion of Nimmer makes plain that the current case law does not

support that claim and argues for a change in the doctrine:

> The discussion above expresses this writer's view that Judge
> Rakoff awarded excessive statutory damages in UMG v.
> MP3.com. This treatise espouses the view that statutory damages
> have to be woven out of the same bolt of cloth as actual damages.

4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.04[E][1][a] n.258.62

(Matthew Bender, Rev. Ed. 2014). Although Nimmer commands respect in the field, its view is

binding on neither the Court nor the parties. Especially where, as here, numerous courts in this

Circuit and elsewhere have adopted plaintiffs' position (and ignored Nimmer's), it is beyond

dispute that such a claim for statutory damages is reasonable.[11]

### 3. Recast of DMCA Claims

Next, Tri-State argues that plaintiffs acted unreasonably by attempting to recast their

DMCA claims as contractual damages. That argument fails for the simple reason that the

DMCA's fee-shifting provisions only cover DMCA claims. See 17 U.S.C. § 1203(b)(5). As

such, they are inapplicable to contract claims regardless of their merit.

***

In sum, the record provides sufficient basis for plaintiffs' "prima facie case and

support[s] an objectively reasonable legal claim to protect [plaintiffs' Software]." Penguin

Books, 2004 WL 728878, at *3. One of the central goals of the DMCA was to strengthen the

digital walls protecting content and punish those who, like Tri-State, attempted to end-run those

protections.[12] See Lexmark, 387 F.3d at 545 ("[The DMCA] prohibits devices aimed at

---

[11] As previously noted, the magistrate judge in this case made such a finding, expressly rejecting Tri-State's argument that a large award of statutory damages was unavailable as a matter of law. See Point 4 I, 2012 WL 3306600 at *13-14.

[12] The Court recognizes that Tri-State argues that its actions do not constitute circumvention because the security measures here did not prevent "access" and because—unlike run-of-the-mill pirates—it was licensed to use the

15

circumventing technological measures that allow some forms of 'access' but restrict other uses of the copyrighted work.") (citing Corley, 273 F.3d at 441); LivePerson, Inc. v. 24/7 Customer, Inc., --- F. Supp. 3d. ---, ---, No. 14-CV-1559 (RWS), 2015 WL 249329, at *5 (S.D.N.Y. Jan. 16, 2015) (finding that the DCMA prohibits affirmative acts to bypass or disable security protocols such as "activation and validation keys" or "a secret handshake protocol, a software security measure ensuring that only authorized users would be able to access [] a particular website") (internal quotation marks and citations omitted).

Although plaintiffs' expansive view of Federal Rule of Evidence 701 ultimately cost them the case,[13] that position was not wholly unfounded. Plaintiffs reasonably—but mistakenly—relied on the Second Circuit's decision in Medforms and the partial summary judgment decision in this case to argue that the declarations in question constituted lay testimony. See Point 4 III, 2013 WL 4409434, at *11, 13 n.24 (addressing both arguments). Because plaintiffs premised their interpretation of Rule 701 on an interpretation of the case law that is, at least, plausible, that argument does not justify an award of fees. See Effie Film, 2013 WL 1759560, at *4 (denying fee award because plaintiff reasonably argued about the line between "creative fictionalization and historical interpretation"); see also Matthew Bender, 240 F.3d at 122 (noting the benefit of litigating close cases so as to clarify the metes and bounds of copyright law).

---

Software. (See, e.g., Tri-State Mem. of Law in Supp. of its Mot. for Summ. J. at 17-22, DE #264; Tri-State SJ Reply & Opp. at 54-58.) The Court did not reach those issues on the merits and offers no view on their viability here. Rather, it notes only that plaintiffs' circumvention claims were facially consistent with the DMCA's overall purpose of encouraging copyright holders' to enforce the digital protections guarding their works.

[13] By stating that the exclusion of the Chadwick and Burden declarations doomed plaintiffs' DMCA claims, the Court in no way suggests what the outcome would have been had the declarations been considered.

## B.    Litigation Conduct

Even where a party took objectively reasonable litigation positions, its "bad faith in the conduct of the litigation is a valid ground for an award of fees." Matthew Bender, 240 F.3d at 125. Bad faith exists where the actions taken by the losing party were both "(1) meritless; and (2) brought for improper purposes such as harassment or delay." Canal+Image UK Ltd. v. Lutvak, 792 F. Supp. 2d 675, 687 (S.D.N.Y. 2011) (quoting Kerin v. U.S. Postal Serv., 218 F.3d 185, 190 (2d Cir. 2000)); accord Baker v. Health Mgmt. Sys., Inc., 264 F.3d 144, 149 (2d Cir. 2001) ("[A]n action is brought in bad faith when the claim is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons.").

First, Tri-State argues that plaintiffs brought this suit not out of concern for their Software but instead in a craven attempt to get "revenge on Tri-State." (Mot. at 6.)  It relies heavily on an email from Michelle Nicol, Point 4's Vice President, to Chadwick, the CEO of DCI, that reads:

> We have been waiting for them to do something like this for 10 years. I knew it was just a matter of time until they would try and go around (both of us). . . . These guys are cheap SOB's and they will do anything to get around the system.

(DE #309 Ex. 36; see also DE #305 Ex. C at P4D01294 (referring to Tri-State as "a bunch of dirty snakes"); DE #309 Ex. 71 ("Kinda feel like if they decide they need more users, they should have to pay the full price & make up for the 1000's of dollars we lost in the past. . . . If it were anyone besides Tristate i'm [sic] sure I would feel different [sic].").)  Tri-State's reliance on those emails (and ones like them) is misplaced.  The mere fact that Point 4's employees disliked or distrusted Tri-State does not alone justify an award of fees.  Rather, Tri-State must show that the suit was initiated for an ulterior motive, unrelated to the plaintiffs' desire to vindicate their rights under the DMCA.  Compare Matthew Bender, 240 F.3d at 125-26

17

(reversing district court award because defendant's refusal to negotiate and exercise of rights provided by the Federal Rules of Civil Procedure provided no basis for a finding of bad faith), with Baker v. Urban Outfitters, Inc., 431 F. Supp. 2d 351, 358 (S.D.N.Y. 2006) (finding plaintiff pursued his claim in an effort to seek a significant settlement from "deep pocketed defendants" and to "garner publicity for [his] agent and for his lawyer"), and Juicy Couture, Inc. v. L'Oreal USA, Inc., No. 04-CV-7203 (DLC), 2006 WL 2591478, at *7 (S.D.N.Y. Sept. 11, 2006) (holding that plaintiff improperly continued the suit after knowing its claims were "devoid of merit" in an attempt to "leverage [its] negotiation of a licensing agreement" or to facilitate its "entry into a new market"). Here, the record—including the Nicol emails—suggests merely that Point 4 intended to enforce its rights under the DMCA against Tri-State, which it perceived as a particularly disreputable former customer. Because the law does not require that plaintiffs happily suffer infringement nor does it compel them to speak favorably of the defendants they believe to have wronged them, those emails do not support a fee award.

Second, Tri-State contends that, despite learning of Tri-State's modification in June of 2010, plaintiffs improperly waited seven months to sue in an effort to "drive up their purported statutory damages, making estimates during this time of the purported statutory damages they knew to be increasing with each passing day." (Mot. at 15.) Contrary to Tri-State's claim of purposeful delay, the record plainly establishes that plaintiffs began actively investigating and assessing their legal options shortly after being put on notice of a possible claimb and that investigation accounts for the delay. Specifically, when plaintiffs first learned that Tri-State may have bypassed the licensing restrictions, they quickly retained intellectual property counsel to assess their legal options and also hired Threat Management and Protection, Inc.—a private

18

investigation firm—to conduct a background report on Judkovitz.[14] See Point 4 III, 2013 WL 4409434, at *4, *27 & n.44. Although Tri-State may wish that plaintiffs had moved more swiftly, as the alleged infringer, its complaints ring particularly hollow. Given the relatively modest delay—that fell well within the statute of limitations—and actual investigatory efforts that plaintiffs carried out prior to filing suit, the seven-month waiting period offers no support for Tri-State's charge of bad faith. Cf. Point 4 III, 2013 WL 4409434, at *27 & nn.43-45 (denying Tri-State's laches defense based on that same period of delay).

Equally unpersuasive is the claim that plaintiffs acted improperly by estimating statutory damages prior to filing suit. During Chadwick's deposition, Tri-State's counsel probed for the factual basis underlying the $6 million statutory damages demand in the Complaint. (DE #286 Ex. 47 at 487:2-489:22.) Seizing on Chadwick's testimony that plaintiffs relied on their "best guesstimate" of the number of violations and corresponding statutory damages, Tri-State contends that plaintiffs must have known how its hack operated and chosen to merely wait for damages to accrue. But the cited deposition testimony establishes only that the plaintiffs had some factual basis for that demand at the time the Complaint was filed—it says nothing about what plaintiffs knew months prior to the completion of their investigation. (See id.) Nor is there anything improper about a party estimating the amount claimed in damages prior to filing suit; to the contrary, plaintiffs acted prudently by attempting to estimate damages at the time of filing,

---

[14] Tri-State incorrectly claims that plaintiffs cannot rely on the evidence in the record regarding their pre-suit investigation because certain witnesses invoked attorney-client privilege when asked why plaintiffs did not sue sooner. (Reply at 8 n.9; Oral Arg. Tr. 46:22-48:2.) Although it is certainly true that plaintiffs cannot now rely on the privileged material they previously refused to produce, that invocation does not limit their ability to rely on information in the record. Nor does invocation of the attorney-client privilege give rise to an adverse inference. See Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 226 (2d Cir. 1999), abrogated on other grounds by Moseley v. V Secret Catalogue, Inc., 537 U.S. 418 (2003). Since the evidence in the record does not lead the Court to believe that the delay likely resulted from some ulterior motive, rather than ordinary pre-suit due diligence, Tri-State has failed to meet its burden of showing bad faith on that basis.

rather than making a pro forma demand. As such, those preliminary estimations do not support a finding of bad faith.

Similarly, Tri-State places substantial weight on the fact that plaintiffs drafted, but ultimately decided not to send, a demand letter. (See DE #309 Exs. 29-30.) Tri-State insists that plaintiffs' choice to sue, rather than to negotiate, is somehow indicative of bad faith. But the Court sees no reason why that should be so. See Matthew Bender, 240 F.3d at 125 ("[A] party confronted by a suspected or potential infringer, [does] not act unreasonably by refusing to cooperate . . . before the initiation of suit."). Thus, the fact that plaintiffs opted to proceed by complaint—rather than by letter—does not justify a fee award.

Third, Tri-State argues that plaintiffs "lied to Judge Dearie" by claiming in a sworn affirmation that they "only recently ascertained the identities of Defendants" in February 2011 when, in fact, they had identified defendants more than seven months earlier. [15] (Mot. at 7 & n.12 (quoting DE #5 ¶ 6 (affirmation of Jason Koral).) At first blush, that affirmation is indeed troubling because "the record unambiguously indicates that plaintiffs were on notice of the activities of at least Tri-State and SJ Computers as of July 2010." Point 4 III, 2013 WL 4409434, at *27 n.46. But read in context of the entire filing, that representation was neither misleading nor material to the preliminary equitable relief plaintiffs sought. Far from seeking to mislead Judge Dearie, plaintiffs submitted a separate affidavit that plainly stated that they identified the three defendants in June 2010. (See Aff. of Roger Petersen, DE #4.) Although a misstatement by a lawyer is certainly not condoned, given that plaintiffs disclosed the relevant facts, the Court declines to find that isolated misstatement to be indicative of bad faith.

---

[15] At oral argument plaintiffs' counsel incorrectly stated that the purported misrepresentation was made orally, rather than in writing. (Oral Arg. Tr. at 26:2-4.)

Fourth, based on purported discrepancies between the declarations Chadwick submitted

at the partial summary judgment and summary judgment stage, Tri-State contends that Chadwick

"concocted a false 'Fourth Modification' to their Software to stave off [partial] summary

judgment." (Mot. at 8-10.) But Tri-State conveniently omits the fact that both declarations

contain exactly the same general description of the Passport Modification:

> The [Fourth Modification] embedded into the Passport start-up
> software a modified script that was programmed to execute each
> time a Tri-State user logged in to UniBasic or Genesys. That script
> issued instructions to bypass the automatic start-up of Passport.

(DE #141 ¶ 21; Press Ex. 16 ¶ 17.) The second declaration then goes on to state:

> On the backup tape, the proper Passport start-up script is installed
> in the DCI directory and consists of a one-line command directing
> Unix to start the Passport Software in the background. . . . Each
> time UniBasic is launched, it checks to see if Passport is running.
> If not, UniBasic executes this start-up script and if Passport does
> not start, UniBasic reports an error and terminates.

> On the image drive, a hacked Passport startup-script is installed in
> the DCI directory removing the command to start the Passport
> software and replacing it with a one-line command to do nothing.
> The replacement command, "echo" is a Unix command directive
> to, in this case, display nothing on a user[']s terminal.

(Press Ex. 16 ¶¶ 19, 21.) Despite Tri-State's colorful commentary, when read together the two

declarations are at least facially consistent; indeed, the second declaration repeats word-for-word

the description contained in the first. The only difference between the two declarations is that

the second one goes on to provide additional detail on the Fourth Modification and describes

specifically how the hacked Software differs from the original. As the claimed differences

between the declarations are arguably not differences at all, the comparison of the two

submissions provides no support to Tri-State's allegation of bad faith.[16] And as Tri-State offers

---

[16] At oral argument, Tri-State argued—for the first time in relation to its fee motion—that the additional detail
provided in the Second Chadwick Declaration undercut plaintiffs' statutory damages claim because it revealed Tri-

no other support for its claim of fabrication, the Court rejects that argument as unsupported by the record.[17]

If anything, it is Tri-State's misleading use of the magistrate judge's Report and Recommendation that strays perilously close to the line. The selective quotations employed by Tri-State in its briefs leave the reader with the distinct impression that the magistrate judge found that plaintiffs fabricated evidence of the Fourth Modification. (See, e.g., Mot. at 15 ("Plaintiffs 'egregiously' fabricated the Fourth Modification to survive Tri-State's motion, and then acted in 'bad faith' to shield the purported Fourth Modification's characteristics from discovery.") (quoting Point 4 III, 2013 WL 4409434, at *14 n.25).) But as Tri-State's counsel eventually conceded at oral argument, the magistrate judge never found, nor even implied, that the plaintiffs fabricated evidence. (Oral Arg. Tr. at 8:10-10:3.)

Fifth, Tri-State points to inspections of its server and a hard-drive that plaintiffs compelled, but never actually took. As a result, Tri-State concludes that those discovery demands must have been made in bad faith. Where the "real motive" underlying discovery

State's hack merely disabled the dongle, rather than circumventing security procedures. (Oral Arg. Tr. at 11:11-12:10.) Relying on MGE UPS Systems, Inc. v. GE Consumer & Industrial, Inc., 622 F.3d 361, 365 (5th Cir. 2010), Tri-State argued that the hack therefore gave rise to only a single act of circumvention and that plaintiffs were objectively unreasonable in contending otherwise. Even if that argument had been properly raised here, which it was not, MGE is arguably distinguishable because "there was no allegation in that case that a code had been inserted that actively circumvented security protections each time a person logged on to the software." Point 4 I, 2012 WL 3306600, at *13 n.15 (citation omitted). Here, a Unix command—"echo"—was inserted into the program that executed each time the Software was run and therefore plaintiffs were not unreasonable in arguing that it circumvented Passport, rather than merely disabling the dongle. Moreover, even if this case were indistinguishable from MGE, it would not be objectively unreasonable for plaintiffs to argue against an out-of-Circuit precedent. To be clear, the Court offers no view on the merits of plaintiffs' circumvention claim, but finds only that binding precedent does not squarely foreclose it and, therefore, it was not improper for plaintiffs to press that claim.

[17] In a single footnote of its opening brief, Tri-State claims that Rule 56(h) provides an alternative basis for a fee award related to the Chadwick and Burden Declarations. (Mot. at 10 n.13.) In that footnote, Tri-State again misstates the record by claiming that Magistrate Judge Mann found that those declarations were "submitted . . . in bad faith." Not so. Magistrate Judge Mann found only that plaintiffs' "reluctance to commit to Chadwick's designation" as an expert was "egregious and indicative of bad faith." Point 4 III, 2013 WL 4409434, at *14 n.25. As noted above, the record offers no support for Tri-State's claim that the contents of those declarations—rather than the Rule 26 designation of their authors—were in any way problematic. Therefore, even if Tri-State had properly raised a claim under Rule 56(h)—instead of burying it in a footnote—an award on that basis would be unwarranted.

requests is a party's desire to "vex and harass" its opponent, an award of fees is justified, Baker, 431 F. Supp. 2d at 358 (citation omitted), but the fact that a party reconsiders a request does not alone suffice. Here, plaintiffs admit that they did not perform the inspections, but explain that they were unable to afford the cost of retaining the third-party inspector that Tri-State requested and the Court required. (Opp. at 14-15.) With respect to Tri-State's server, the Court proposed a discovery protocol after a lengthy hearing at which Tri-State repeatedly argued that such an inspection was unnecessary because it had represented that the server in question did not contain any copies of the Software. (See Nov. 10, 2011 Hrg. Tr., DE #250.) It is difficult to understand how plaintiffs acted in bad faith by subsequently opting to take Tri-State at its word so as to avoid the substantial cost of a third-party inspector and instead focus on the partial summary judgment motion.[18] On the hard drive dispute, plaintiffs similarly objected to the cost of Tri-State's proposal to require a third-party vendor to conduct the inspection, rather than allowing them to inspect the drive. (DE #240 at 2.) When the magistrate judge ultimately sided with Tri-State (DE #242 at 9), plaintiffs decided to forego the discovery. That is hardly the smoking gun of bad faith that Tri-State makes it out to be. Rather, it is entirely plausible that in the face of such expenses (and with summary judgment looming), plaintiffs just concluded that they "lacked the resources to" inspect the drive. (Opp. at 14-15.) By deciding that they could not bear the cost of a third-party discovery vendor, plaintiffs' actions reflected not bad faith, but simply the

---

[18] That is particularly true where, as here, the discovery proposal at issue was raised by the Court rather than one proposed by the parties. (See Nov. 10, 2011 Hrg. Tr. 25:6-27:1.) It certainly does not strain the imagination to believe that a party acting in good faith might initially accept such a proposal as reasonable, but later determine, upon further reflection, that it is too costly. Especially since Tri-State repeatedly argued that such discovery was unnecessary in light of the representations it made on the record (see, e.g., id. at 40:4-6), it is certainly ironic that it now argues that plaintiffs' failure to conduct that purportedly unnecessary discovery evinces bad faith.

economic realities accompanying this protracted, bitterly fought and exceedingly costly litigation.[19]

Sixth, Tri-State claims that plaintiffs unnecessarily increased the costs of this litigation by objecting to each of the reports and recommendations that the magistrate judge issued in this case and by seeking sanctions on several occasions. It is unclear how either of those actions amounts to bad faith. The Second Circuit has made it abundantly clear that there is nothing wrong with pursuing rights granted by the Federal Rules of Civil Procedure. See Matthew Bender, 240 F.3d at 125-26. Since the Federal Rules permits plaintiffs to object to orders issued by the magistrate judge or seek sanctions, such actions constitute bad faith only if they are plainly frivolous. See id. at 126. The record does not support such a finding here and therefore those objections and motions provide no basis for a fee award.[20]

Finally, Tri-State contends that plaintiffs' failure to upgrade the Software's security features after learning of its hack reveals that this suit was brought for monetary gain, rather than to protect their Software. (See Mot. at 15.) But plaintiffs persuasively respond that they did not invest in additional security features because "Tri-State's scorched earth tactics forced [them] to spend substantial amounts on legal fees" leaving them unable "to afford" such upgrades. (Opp. at 34.) Instead, plaintiffs explain that they "hoped to fund" those upgrades "with the proceeds from th[is] lawsuit." (Id.) Because such a claim appears plausible on its face—and Tri-State has

---

[19] Indeed, as plaintiffs argue, the fact that they relieved the major law firm that had been representing them on the eve of summary judgment and switched to a small practice strongly suggests that their litigation coffers were starting to run dry. (See Oral Arg. Tr. at 35:5-19.)

[20] To the extent that Tri-State relies on Point 4 IV to argue that plaintiffs improperly increased the costs of this litigation by "essentially repeating arguments already considered and rejected by Magistrate Judge Mann" it misreads the opinion. (Mot. at 10 (quoting Point 4 IV, 2013 WL 5502852, at *7).) The Court did not indicate that it is improper for a party to object based on arguments rejected by the magistrate judge; rather, the Court explained that it need not rehash the entire analysis because it agreed with the magistrate judge's findings. See Point 4 IV, 2013 WL 5502852, at *7. As the law is clear in this Circuit that parties may, in fact, object only on the basis of arguments that were properly presented to the magistrate judge, see Fisher v. O'Brien, No. 09-CV-42 (CBA) (LB), 2010 WL 1286365, at *1 (E.D.N.Y. Mar. 30, 2010) (collecting cases), plaintiffs' objections do not support a finding of bad faith.

offered no evidence to contradict it—the Court concludes it has not carried its burden of establishing bad faith. The fact that Tri-State would have preferred that plaintiffs respond to its hack by upgrading security—rather than filing suit—does not transform its reasonable response into one motivated by bad faith.

***

This litigation can only be described as a grueling affair. Both sides have fought relentlessly and conceded little, if any, ground. "[T]he intense personal animosity and business rivalry that pervaded the relationship between the principal parties" undoubtedly fueled the unrelenting approach adopted by counsel. TVT Records, 446 F. Supp. 2d at 241. Although the scorched-earth tactics employed by both parties may ultimately have been ill advised, that alone does not justify a finding of bad faith. Moreover, given that both sides stand equally responsible for this lack of commonsense and civility, "[t]o level all blame and penalize only one side on this basis with an award of legal fees and costs would not be equitable or otherwise justified." Id. Since the Court has "has no reason to doubt that . . . [plaintiffs] sincerely believed that [their Software] was entitled to copyright protection and pursued [their] claim for the purpose of vindicating [their] rights," that weighs against an award of fees. Effie Film, 2013 WL 1759560, at *4 (quoting Silverstein v. Penguin Putnam, Inc., No. 01-CV-309 (JFK), 2008 WL 678559, at *4 (S.D.N.Y. Mar. 12, 2008) (internal quotation marks omitted)).

Accordingly, Tri-State's motion for fees based on plaintiffs' bad faith is denied.

### C.   Financial Strength of the Parties

In arguing about whether considerations of compensation and deterrence justify an award of fees, the parties vie for underdog status and each claim that the award (or denial) of fees would chill their ability to defend (or pursue) their rights under the DCMA. (Mot. at 17-18; Opp.

25

at 35.) Although both parties describe themselves as "small" businesses, neither side supports that claim with any record evidence. (See Mot. at 17; Opp. at 35.)

In any event, even crediting Tri-State's claim, its small size does not justify a fee award. The fact that a party is a "small company without a litigation budget . . . does not mean that it must be compensated for the cost of defending against a not unreasonable copyright infringement claim." Jovani Fashion, 820 F. Supp. 2d at 574. Nor is any financial disparity between the parties relevant to the fee award. See Penguin Books, 2004 WL 728878, at *6 ("The decision to award attorney's fees is based on whether imposition of the fees will further the goals of the Copyright Act, not on whether the losing party can afford to pay the fees.") (quoting Harrison Music Corp. v. Tesfaye, 293 F. Supp. 2d 80, 85 (D.D.C. 2003)). The Court therefore places no weight on the respective size or financial position of the parties in determining whether to award fees.[21]

***

In sum, awarding fees here would do little to advance the DMCA's statutory purpose of enforcing copyright protection in the digital age. Although ultimately unsuccessful, plaintiffs took reasonable actions after learning that Tri-State hacked their Software and disabled its security protocols. Under those circumstances, neither compensation nor deterrence supports an award in favor of Tri-State. If anything, deterrence weighs against a fee award so as to ensure that future parties do not resort to self-help hacking to resolve their licensing disputes. Moreover, since summary judgment here resulted not from Tri-State's success but rather from plaintiffs' failure to comply with the rules governing expert discovery, a fee award would only serve to doubly sanction plaintiffs for that procedural error. As plaintiffs took reasonable

---

[21] Although "financial disparities may be a factor considered in determining the magnitude of an award," Penguin Books, 2004 WL 728878, at *5, the Court need not reach that analysis as it declines to issue an award in the first instance.

26

litigation positions, Tri-State failed to establish bad faith and no other factors favor an award, the Court denies Tri-State's motion for fees related to the DMCA claims.

## II.    Fees on the Lanham Act Claims

Section 1117(a) of the Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a)(3). The Second Circuit has interpreted that language as allowing an award "only . . . on evidence of fraud or bad faith" or in the case of "willful infringement." Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 111 (2d Cir. 2012) (internal quotation marks and citations omitted). "Bad faith requires more than simply an unpersuasive claim," Jovani Fashion, 820 F. Supp. 2d at 576, but parties that "[p]ursu[e] frivolous, meritless or otherwise baseless litigation" or "fail[] to develop evidence to support a litigation position" may fall within the fee-shifting provision. Cross Commerce Media, Inc. v. Collective, Inc., No. 13-CV-2754 (KBF), 2014 WL 7323419, at *2 (S.D.N.Y. Dec. 16, 2014) (citations omitted); Therapy Prods., Inc. v. Bissoon, No. 07- CV- 8696 (DLC), 2009 WL 2709279, at *2 (S.D.N.Y. Aug. 26, 2009) (noting that courts may "infer[] bad faith" where claims are sufficiently meritless) (collecting cases). But "[e]ven with a finding of bad faith, the decision to award attorney's fees remains within the sound discretion of the district court." Gen. Nutrition Inv. Co. v. Gen. Vitamin Ctrs., Inc., 817 F. Supp. 2d 66, 74 (E.D.N.Y. 2011) (quoting Prot. One Alarm Monitoring, Inc. v. Exec. Prot. One Sec. Serv., LLC., 553 F. Supp. 2d 201, 208 (E.D.N.Y. 2008)); see also Mister Softee of Brooklyn, Inc. v. Boula Vending Inc., 484 F. App'x 623, 624 (2d Cir. 2012) ("While we have said that a finding of willfulness, fraud, or bad faith is a prerequisite to . . . an award of fees under section 1117(a), we have never held that a finding of willfulness, fraud, or bad faith automatically requires an award of fees under that section.") (internal quotation marks and citation omitted).

27

Plaintiffs alleged that Tri-State's manipulation of their Software constituted unfair competition in violation of Section 43 of the Lanham Act. Such a claim centers on "whether the public is likely to be misled into believing that the defendant is distributing products manufactured or vouched for by the plaintiff." Warner Bros. v. Gay Toys, Inc., 658 F.2d 76, 79 (2d Cir. 1981) (internal quotation marks and citation omitted). There are two essential elements to a federal unfair competition claim: (1) "a valid mark that is entitled to protection" and (2) "that the defendant's actions are likely to cause confusion with the plaintiff's mark." Point 4 III, 2013 WL 4409434, at *24 (internal quotation marks and citation omitted). "To qualify for protection under the Lanham Act, the mark must be sufficiently distinctive and 'used in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" Id. (quoting Lopez v. The Gap, Inc., 883 F. Supp. 2d 400, 414-15 (S.D.N.Y. 2012) (emphasis in original)). "A likelihood of confusion arises 'when an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.'" Id. (quoting Lopez, 883 F. Supp. 2d at 419). "To determine likelihood of confusion, courts weigh various factors, first identified in Polaroid Corp. v. Polarad Electric Corp., 287 F.2d 492, 495 (2d Cir. 1961)."[22] Id.

In this case, plaintiffs alleged "that Tri-State 'recreated' the start-up screen containing their trademarks" and "[i]n doing so, . . . aimed to, and did mislead and deceive users as to the origin, sponsorship, or approval of the hacked program." Point 4 III, 2013 WL 4409434, at *23. But as plaintiffs neither identified the particular marks that were purportedly misappropriated nor established that consumers (rather than users) were confused by that recreated start-up screen,

---

[22] The Polaroid factors include: (1) the strength of plaintiff's mark; (2) the similarity of the marks; (3) the proximity of the parties' products; (4) the likelihood that the plaintiff will bridge the gap; (5) actual consumer confusion; (6) bad faith of the defendant in adopting the similar mark; (7) the quality of the defendant's products; and (8) sophistication of the consumer." Point 4 III, 2013 WL 4409434, at *24 n.39 (citation omitted).

the magistrate judge recommended that the Court grant summary judgment on plaintiffs'
Lanham Act claims. Id. at *24-25. The Court adopted that portion of the R&R without
objection and dismissed the Lanham Act claims. Point 4 IV, 2013 WL 5502852, at *10.

As plaintiffs failed to provide evidentiary support for their Lanham Act claims, Tri-State
argues that a fee award is justified here. (Mot. at 19-20.) Tri-State reasons that the Court should
infer bad faith—bringing this case within those deemed exceptional—because plaintiffs' Lanham
Act claims were meritless. (Reply at 10-11.) Although it is certainly true that courts confronted
with patently baseless claims may conclude that a party acted to serve some ulterior motive,
Therapy Products, 2009 WL 2709279, at *2, the mere fact that a claim does not succeed does not
automatically result in such a finding, Jovani Fashion, 820 F. Supp. 2d at 576. Here, it is clear
that plaintiffs mistakenly believed that confusion among users of the Software—rather than
purchasers—provided sufficient basis for their claim. See Point 4 III, 2013 WL 4409434, at *25
n.40. That legal error resulted in dismissal, but provides no support for the claim of bad faith
that Tri-State now raises. See Banff, Ltd. v. Colberts, Inc., 810 F. Supp. 79, 81 (S.D.N.Y. 1992)
("[Plaintiff's] reliance on faulty interpretations of the law does not support an award of attorney
fees on the basis that the lawsuit was unfounded."), aff'd 996 F.2d 33 (2d Cir. 1993). The Court
therefore concludes that this case is not one of the exceptional few where a fee award is justified.
See Parker Waichman LLP v. Gilman Law LLP, No. 12-CV-4784 (JS) (AKT), 2014 WL
502382, at *2 (E.D.N.Y. Feb. 7, 2014) ("Plaintiff's failure to plead its claim adequately, 'absent
any evidence of an improper purpose, is at worst incompetent.'") (quoting Multivideo Labs, Inc.
v. Intel Corp., No. 99-CV-3908 (DLC), 2000 WL 502866, at *3 (S.D.N.Y. Apr. 27, 2000));
Societe Del Hotels Meridien v. LaSalle Hotel Operating P'ship, No. 02-CV-4090 (JSM), 2003
WL 21982959, at *1 (S.D.N.Y. Aug. 20, 2003) ("While the Court believes that this lawsuit was
ill-advised and that it had little merit, the Court cannot conclude that it was brought in bad

29

faith."); see also Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics, 166 F.3d 438, 439 (2d Cir. 1999) (per curiam) ("The present litigation may not have been strong on the merits but raised enough nonfrivolous claims to preclude the awarding of fees.").

Tri-State mistakenly relies on statements made by the Court during one of the many conferences in this case to support its claim of bad faith.[23] During that conference the Court, as is its practice, inquired as to whether it would be possible to narrow the issues so as to reduce the time and expense required for motion practice. (See Aug. 13, 2012 Hrg. Tr. at 4-8, DE #305 Ex. 39.) As part of that effort, the Court noted that its preliminary review of the record revealed that the Lanham Act claims were likely meritless. (See id.) Unsurprisingly, Tri-State makes no mention of the fact that the Court viewed with equal skepticism its claim that possession of a license somehow immunized its hacking from DMCA liability. (See id. at 10, 16-19.) But neither set of comments constituted adverse findings, rather—as both parties seemed to realize at the time—those comments merely sought clarification on certain claims and issues raised by the parties. Moreover, since those comments go only to the merits of the claims—rather than the motivation of the parties pursuing them—they provide little, if any, support to Tri-State's charge of bad faith. See Multivideo Labs, 2000 WL 502866, at *3 n.2 (finding plaintiff did not act in

---

[23] In particular, Tri-State focuses on an exchange between the Court and plaintiffs' counsel at the pre-motion conference preceding the cross-motions for summary judgment:

> THE COURT: Are you going to take th[e] [Lanham Act] claim to its bitter end in terms of litigating this or not?
> MR. KORAL: Your Honor.
> THE COURT: It doesn't seem like the theory is very viable. I know in this litigation people have operated on the principle both sides of we're not going to give an inch unless we're absolutely forced to, which is just problematic to the courts in general having to deal with this case but that seems to be the approach that people have taken to litigation. But there's no compromise here of even narrowing some of the issues.
> . . . .
> MR. KORAL: Well, Your Honor, we feel very confident of the legal viability of the unfair competition claim.

(Aug. 13, 2012 Hrg. Tr. at 5-6, DE #309 Ex. 35.)

bad faith in pursuing its Lanham Act claim even after being expressly warned by the district

court, in an opinion, that "there was no evidence to support [that] claim"); cf. Banff, 996 F.2d at

36 (affirming denial of fee award even where prior precedent foreclosed plaintiff's claims).

Similarly unpersuasive is Tri-State's argument that the inability of plaintiffs' Rule

30(b)(6) corporate representative to identify the factual basis for plaintiffs' Lanham Act claims

somehow evinces bad faith. (Mot. at 20.) Specifically, Tri-State relies on the following passage

from Chadwick's deposition:

> Q. Dynamic sued Tri-State in this lawsuit for violating New
> York's unfair competition law, sir; is that true or not?
> A. Yes, I believe it is.
> Q. What is the factual basis for that claim, Mr. Chadwick?
> MR. GREENWALD: Objection as to form.
> THE WITNESS: I don't know. I'm not a lawyer.
> MR. NAGY: Q. Which of the damages . . . are caused by the
> violation of that New York unfair competition law.
> A: I don't know.
> MR. GREENWALD: Objection as to the form.
> THE WITNESSS: Sorry. I don't know. I'm not a lawyer.[24]

(DE #309 Ex. 25 at 365:11-366:1.) That a fact witness was not able to match legal claims with

facts in the record is not particularly probative. As plaintiffs' counsel recognized, such questions

appear objectionable as they call for a legal conclusion—i.e., that certain facts support a legal

claim. Because Chadwick's deposition testimony does not give rise to an inference of bad faith,

but instead merely reflects a client's ignorance of the relevant legal framework, it provides no

basis for a fee award under § 1117(a).

Next, Tri-State argues that conflicting admissions made by plaintiffs support a finding of

bad faith. At the partial summary judgment stage, plaintiffs admitted that Tri-State is not a

competitor of either plaintiff, but reversed course at summary judgment and claimed that Tri-

---

[24] As an initial matter, Tri-State fails to mention in its brief that the portion of the deposition it relied on discussed only state law, rather than federal claims.

State competed with them by providing Genesys to subsidiaries that were not licensed under the Agreement. (DE #142 ¶¶ 4-5, DE #280 ¶¶ 3-4.) Although those statements may be contradictory, they do not necessarily indicate bad faith.[25] To the contrary, the most natural reading of the record indicates that plaintiffs mistakenly admitted a fact at partial summary judgment and then attempted to back-track after realizing the import of that admission. Regardless of whether that attempt could succeed, such a strategic blunder provides no basis for a fee award as it does not cast doubt on plaintiffs' motivation for asserting or maintaining their Lanham Act claims.

Because Tri-State fails to establish that plaintiffs pursued their Lanham Act claims in bad faith or fraudulently, its fee request must be denied. See Louis Vuitton, 676 F.3d at 111 (holding that such a finding "determines the right to attorney's fees") (quoting Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 854 (2d Cir. 1995)); N.Y. Stock Exch., Inc. v. Ghary, No. 00-CV-5764 (RLC), 2003 WL 68038, at *3 (S.D.N.Y. Jan. 8, 2003) (similar); Conopco, Inc. v. Campbell Soup Co., No. 93-CV-4245 (LAP), 1995 WL 404847, at *2 (S.D.N.Y. July 6, 1995) (similar). Moreover, even if Tri-State could establish bad faith, the Court would exercise its discretion to deny a fee award in this case. Courts in this Circuit have declined to award fees in cases, like this one, that "present[] a number of close and contested issues" and where "the outcome was by no means a foregone conclusion." Simon & Schuster, Inc. v. Dove Audio, Inc., 970 F. Supp. 279, 302 (S.D.N.Y. 1997); Lurzer GMBH v. Am. Showcase, Inc., 75 F. Supp. 2d 98, 102-03 (S.D.N.Y. 1998). An award here would be particularly inappropriate as this suit centered on Tri-State's circumvention of the Software's licensing restrictions—and the related DMCA claim—rather than the purported manipulation to the start-up screen underlying the

---

[25] They may not even be truly contradictory as plaintiffs expressly provided that their Rule 56.1 responses were "made for the purposes of this motion only and shall not be deemed an admission for any other purpose." (DE #142 ¶ F (citing Local Civil Rule 56.1(c)).)

Lanham Act claim. Cf. Patsy's Italian Rest., Inc. v. Banas, 575 F. Supp. 2d 427, 471 (E.D.N.Y. 2008) (denying fee award under the Lanham Act because the bulk of the case focused on trademark infringement, rather than unfair competition).

## III.    Fees on Contractual Claims

"Because promises in a contract to indemnify the other party's attorney's fees run against the grain of the accepted policy that parties are responsible for their own attorneys' fees, courts applying New York law should not infer a party's intention to provide counsel fees as damages for a breach of contract unless the intention to do so is unmistakably clear from the language of the contract." Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 177 (2d Cir. 2005) (Sotomayor, J.) (internal quotation marks and citations omitted).

The Agreement here contains two fee-shifting provisions:  one in Paragraph 21 and one in Paragraph 40.  Tri-State rests its fee request solely on Paragraph 21, which provides in full:

> In the event Point 4 defaults in installing and implementing the
> system, and terminates the contract without cause, then Tri-State
> shall have the right to retain services of any other party or entity
> and Point 4 shall be liable for all damages incurred by Tri-State in
> having another party or entity complete the contractual work. In
> the event Tri-State defaults and fails to make payment within thirty
> days of the date due as stated in Purchase Agreement, then Point 4
> may terminate the contract for cause and Tri-State shall be liable
> for damages for breach of contract. In all instances, the losing
> party shall be liable to the winning party for legal fees.

(Press Ex. 1 ¶ 21.)  Relying on the last sentence of that paragraph, Tri-State argues that it expressly mandates an award of fees to the prevailing party in any breach of contract action. (Mot. at 22-23; Reply at 11.)  But read in the context of the entire paragraph that sentence shifts fees only in two instances:  a breach based on Point 4's failure to "install[] and implement[] the system" or one based on Tri-State's "fail[ure] to make payment."  (See Press Ex. 1 ¶ 21.) Because Tri-State's interpretation would render superfluous the distinct provision in Paragraph

33

40—shifting fees related to the confirmation and enforcement of an arbitration award—the Court rejects that reading of the contract. See Verzani v. Costco Wholesale Corp., 641 F. Supp. 2d 291, 299 (S.D.N.Y. 2009) ("[T]he court may not read the agreement to make any of its terms meaningless, or construe its language to render particular provisions mere surplusage." (citing Reiss v. Fin. Performance Corp., 97 N.Y.2d 195, 199 (2001))). Accordingly, the Court concludes that the plain text of Paragraph 21 shifts fees only in cases related to installation or delivery, on the one hand, and payment, on the other.

Despite the plain language of the contract, Tri-State argues that the Court should adopt its interpretation because plaintiffs' prior counsel admitted that plaintiffs would be "'entitled to recover fees' under 'the contractual agreements.'" (Reply at 11 (quoting Sept. 7, 2012 Hrg. Tr. at 27:4-9).) Those statements are of no moment because under New York law "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002). Since the language of the agreement is subject to no ambiguity, extrinsic evidence—like the prior statements identified by Tri-State—is irrelevant to its interpretation.[26] Id.

Nevertheless, Tri-State next claimed at oral argument that judicial estoppel should bind plaintiffs to their prior counsel's in-court representation that fees would be shifted here. (Oral Arg. Tr. 56:3-15.) Not only is that claim waived due to Tri-State's failure to raise it in its briefs, Goldberg v. UBS AG, 690 F. Supp. 2d 92, 98-99 (E.D.N.Y. 2010), it is also wholly meritless because "judicial estoppel 'applies only if the party against whom the estoppel is claimed actually obtained a judgment as a result of the inconsistent position.'" Whitehurst v. 230 Fifth, Inc., 998 F. Supp. 2d 233, 258 (S.D.N.Y. 2014) (quoting Merrill Lynch, Pierce, Fenner & Smith,

---

[26] Even if the Court were to consider extrinsic evidence, it would afford those statements no weight because arguments made in a 2012 conference offer little, if any, insight into what the parties intended when they entered the Agreement back in 1999.

Inc. v. Georgiadis, 903 F.2d 109, 114 (2d Cir.1990)).  Since plaintiffs did not prevail on their contract claims, judicial estoppel does not bind plaintiffs to the erroneous interpretation of the contract offered by their prior counsel.  Id.

Nor does the award of fees related to a prior arbitration between the parties estop plaintiffs because Point 4's position in the arbitration is not inconsistent with its argument here. In that case, Tri-State alleged that Point 4 breached the Agreement and thereby relieved it of its obligation to remit payment.  (See Press Ex. 2.)  The arbitrator, Nicholas de B. Katzenbach, rejected that claim and found that because Point 4 had not breached the agreement it was entitled to payment and an award of attorneys' fees under Paragraph 21 of the Agreement.  (Id.)  That award easily squares with the interpretation of Paragraph 21 that plaintiffs offer here because the dispute concerned Tri-State's failure to pay, which is one of the defaults specifically enumerated in that section.  Accordingly, even if Tri-State had properly raised judicial estoppel, the prior arbitration award would not support its position.

Thus, the Court denies Tri-State's request for a fee award related to plaintiffs' contractual claims.

## IV.    Costs

Finally, Tri-State moves for an award of costs pursuant to Federal Rule of Civil Procedure 54(d).  Plaintiffs oppose that request and argue that costs should not be awarded because Tri-State is not the prevailing party.  Moreover, plaintiffs contend that a request to tax costs is premature because an appeal is pending in this matter.

"As a general matter, 'costs—other than attorney's fees—should be allowed to the prevailing party.'"  Carter v. Inc. Vill. of Ocean Beach, 759 F.3d 159, 163 (2d Cir. 2014) (quoting Fed. R. Civ. P. 54(d)(1));  Whitfield v. Scully, 241 F.3d 264, 270 (2d Cir. 2001) (noting that "because Rule 54(d) allows costs as of course, such an award against the losing party is the

35

normal rule obtaining in civil litigation, not an exception") (internal quotation marks and citation omitted). "[A] prevailing party . . . is one who has achieved a judicially sanctioned change in the legal relationship among the parties." Dattner v. Conagra Foods, Inc., 458 F.3d 98, 102 (2d Cir. 2006) (internal quotation marks and citation omitted). "Usually the litigant in whose favor judgment is rendered is the prevailing party for purposes of Rule 54(d)." 10 Wright, Miller & Kane, Federal Practice and Procedure: Civil § 2667 (3d ed. 2014). "A party who is only partially successful also can be deemed a prevailing party." Id. But where both parties file claims "for affirmative relief and neither party prevails on its claim, it is quite appropriate to deny costs to both parties." Srybnik v. Epstein, 230 F.2d 683, 686 (2d Cir. 1956); accord Marcella v. ARP Films, Inc., 778 F.2d 112, 120 (2d Cir. 1985); Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc., 412 F. Supp. 2d 571, 574 (E.D. Va. 2006).

Here the Court granted summary judgment against Tri-State on each of its counterclaims and against plaintiffs on each of their claims except for one $8,484 contract claim that was later voluntarily dismissed. (DE #361-62.) The Clerk of Court then entered Judgment accordingly. (DE #364.) Based on that resolution, plaintiffs argue that the balance of the Judgment was either in their favor or mixed such that neither party prevailed. Tri-State responds that it asserted purely defensive counterclaims and that, in any event, they are the "clear winner" because this litigation centered on the multi-million dollar claims brought by plaintiffs, rather than Tri-State's limited counterclaims. The Court need not delve too deeply into the nature of Tri-State's counterclaims because the parties spent little time litigating them and focused almost entirely on plaintiffs' claims. See Scientific Holding Co. v. Plessey Inc., 510 F.2d 15, 28 (2d Cir. 1974) (noting that district courts routinely award fees to defendants "who successfully fend[] off a large claim despite [their] failure to prevail on a counterclaim"). Moreover, the counterclaims here were either defensive in nature—i.e., contribution and indemnification—or drew from the same

36

operative facts as claims asserted by plaintiffs—i.e., the contractual duties under the licensing agreement—and therefore "[t]he proof required to defend against [plaintiffs'] claims was substantially the same as the proof required to support [Tri-State's] counterclaims." <u>Dagen v. CFC Grp. Holdings, Ltd.</u>, No. 00-CV-5682 (CBM), 2004 WL 856539, at *3 (S.D.N.Y. Apr. 21, 2004). Although Tri-State's counterclaims were dismissed, the Court concludes it is nevertheless entitled to an award of costs as it prevailed on the DMCA claims, Lanham Act claims and the overwhelming majority of the contract claims that drove this litigation.

Plaintiffs next correctly note that Local Rule 54.1 prohibits the taxation of costs until the Second Circuit decides the pending appeal. <u>See</u> Local Civ. R. 54.1(a) ("Costs will not be taxed during the pendency of any appeal, motion for reconsideration, or motion for a new trial."). As such, the Clerk held Tri-State's notice of taxation of costs in abeyance pending the resolution of the appeal in this matter.[27] Pursuant to Local Rule 54.1, the party seeking to tax costs must file a new (and updated) notice of taxation of costs after the appeal is decided and then the opposing party will be afforded an opportunity to object to items listed in that notice. <u>See</u> Fed. Civ. R. 54.1(a)-(b).

---

[27] The fact that the Second Circuit stayed the appeal pending resolution of Tri-State's motion for attorneys' fees and costs does not require a different outcome. (DE #382.) Tri-State's motion merely sought a determination that they were entitled to costs as the prevailing party. (<u>See</u> Mot. at 23.) It did not seek to have the Court actually tax those costs, but instead properly directed that request to the Clerk of Court. (<u>See</u> DE #368.) Since Tri-State sought only a stay pending this Court's resolution of its motion—not the Clerk's taxation of costs—the stay ultimately granted by the Second Circuit does not impact that distinct process.

## CONCLUSION

For the reasons stated above, the Court denies Tri-State's motion for attorneys' fees, but finds that it is entitled to an award of costs under Federal Rule of Civil Procedure 54(d). Pursuant to Local Rule 54.1(a), Tri-State may submit a new notice of taxation of costs once the Second Circuit has resolved the pending appeal in this matter.

SO ORDERED.

Dated: September 10, 2015
      Brooklyn, New York

s/Carol Bagley Amon

Carol Bagley Amon
Chief United States District Judge